**Douglas RUBINS, Plaintiff,**

v.

**Captain G. ROETKER, B. Lucero, J. Singleton, C. Chaddick, C. Pohl, J. Casserly, R. Thurlow, and John Doe, Defendants.**

**Civ. A. No. 89–C–1727.**

United States District Court, D. Colorado.

May 23, 1990.

Douglas Rubins, Canon City, Colo., pro se.

Thomas Lyons, Asst. Atty. Gen., Denver, Colo., for defendants.

## ORDER

CARRIGAN, District Judge.

Petitioner Douglas Rubins, an inmate incarcerated at the Territorial Correctional Facility in Canon City, Colorado, has filed this action pursuant to 42 U.S.C. § 1985(3) alleging violations of his Eighth Amendment right to be free from cruel and unusual punishment. This case was assigned to Magistrate Abram who reviewed the matter and prepared a recommendation pursuant to Local Rule 605. Copies of both the recommendation and Local Rule 605 were mailed to the plaintiff on February 22, 1990. Plaintiff filed an objection to the Magistrate's recommendation on March 15, 1990.

Plaintiff alleges guard brutality rising to cruel and unusual punishment as a result of an altercation that occurred between the plaintiff and the defendants on July 13, 1989. He claims that the defendants in their roles as prison guards engaged in a conspiracy: (1) to inflict excessive and unwarranted corporal punishment on the plaintiff; (2) to wrongfully justify the corporal punishment; (3) to fabricate evidence during a state criminal proceeding where the plaintiff faced charges of violating the Code of Penal Discipline;[1] (4) to lie under oath in the state criminal proceeding; and (5) to prepare false written reports of the incident.

The Magistrate recommends dismissal of the plaintiff's complaint based upon his evaluation of the plaintiff's and the defendants' credibility during an evidentiary hearing on this matter. During that hearing the Magistrate heard testimony of the plaintiff and all the defendants. The Magistrate concluded that the defendants' version of the altercation set forth the true version of the July 13, 1989 incident. The Magistrate stated:

"On cross-examination Plaintiff admitted that while he was in the holding cell he was kicking the door to the holding cell and was shouting obscenities. He also admitted that he was given several orders to settle down. When asked how many times he was ordered to settle down, Plaintiff responded while laughing, 'I'd say three but it could be 50.' Plaintiff stated that he initially complied with the orders to settle down but after a few minutes he started kicking the door again and shouting more obscenities.

Defendant Roetker, Corrections Supervisor assigned to Territorial's infirmary, testified that he was on duty on July 13, 1989 and that he prepared a report regarding the incident with Plaintiff. *See* Plaintiff's exhibit 1. Roetker stated that he heard a tremendous amount of noise coming from one of the holding cells of the infirmary. At this time Roetker was located one floor above the holding cells. The infirmary guard requested back-up help to deal with 'the inmate who was in the holding cell raising a ruckus.' So Roetker proceeded downstairs. There was still alot of noise and Roetker could see the security door to the holding cell moving back and forth.[2] Roetker asked what was going on and the infirmary guard stated that the inmate in the holding cell wanted to go back to cellhouse three because he was missing his yard

---

1. Plaintiff was also charged with Assault on a Peace Officer in the Fremont County, Colorado District Court. This case had not been resolved as of the date of the Magistrate's recommendation.

2. At this point of the hearing Plaintiff appeared very amused and was laughing as he listened to Roetker's testimony.

time. Roetker approached the holding cell. The inmate was still banging the door and 'screaming profanities at everybody that walked by and raising hell.' Roetker asked the inmate what the problem was and told him to settle down. Roetker identified the inmate in the holding cell as the Plaintiff. Plaintiff stated that he wanted to go back to cellhouse three because he was missing his yard time. Roetker apologized for the conflict with Plaintiff's yard time and told him to settle down. Plaintiff stated he was not going to settle down and that he wanted to go back to cellhouse three.

Plaintiff did settle down for about five or ten minutes but then he went off again shaking the door and shouting more obscenities. Roetker approached the holding cell again and attempted to talk the Plaintiff into settling down. At this time Plaintiff 'got real belligerent' and started calling Roetker and the other officers names such as 'neo-nazi pigs son of bitching mother-fuckers.' Plaintiff then threatened the officers and tried to antagonize them by saying 'Why don't you all come in and kick my ass or see what you can do.' In response to this Roetker discontinued operations in the infirmary. He locked down about 20 inmates that were in the infirmary and instructed the infirmary's staff (about 12 to 15 people) to remain in their respective areas.

Roetker then called Territorial control for back-up and escort officers to move the Plaintiff back to cellhouse three. Roetker explained to control that he needed the back-ups immediately because Plaintiff had become very aggressive and 'had expressed a desire to get into a physical altercation in a violent setting with the staff that were present.' Roetker told control that he was planning on placing restraints on the Plaintiff and Roetker requested an electric stun gun in case there were problems transporting the Plaintiff. Roetker testified that he was expecting a fight because of Plaintiff's threats. About four or five officers arrived quickly with two stun guns. Roetker then tried to determine the level of training of the officers that arrived to help. He asked which officers had taken a course in Pressure Point and Control Tactics and which had taken a course in the use of the electric stun gun. Roetker was the only officer that had taken Pressure Point and Control Tactics and he and Defendant Chaddick were the only officers that had been trained to use the stun gun.

The officers formulated their plan of restraining the Plaintiff and transporting him back to cellhouse three. Roetker told the Plaintiff to move back from the cell door and to sit down facing away from the door. Plaintiff would not sit down. Roetker instructed the Plaintiff to stand with his feet a certain way (as learned in Pressure Point and Control Tactics). Plaintiff partially complied with the instruction. The officers then entered the cell. Roetker held the stun gun against the Plaintiff and told him not to make any sudden moves, that they were going to place handcuffs on him and then transfer him back to cellhouse three. One cuff was placed on Plaintiff. The second cuff was just being applied as Roetker tried to pat search Plaintiff. Plaintiff started twisting, throwing his elbows backward, moving his head around and kicking with his feet. Thus, Roetker instructed everybody to move out of the cell into the hallway so that he could finish the pat search. Plaintiff started 'thrashing about and kicking and pushing and throwing elbows.' So Defendant Singleton grabbed a handful of Plaintiff's hair, got the Plaintiff through the door and grabbed Plaintiff around the upper body. As Roetker exited the cell he observed Singleton and Plaintiff spinning around and then Singleton losing his feet. Singleton fell to the floor with Plaintiff on top of Singleton. Singleton was on his back and still had his arm wrapped around Plaintiff's upper body. Roetker testified that as Plaintiff was being moved out of the cell he was 'doing a lot of foot action' and probably pushed off of the wall with his foot to cause he and Singleton to fall. Roetker stated a number of times that it was like

Plaintiff was peddling a bicycle he was kicking and resisting so much.

Defendant Chaddick then applied one of the stun guns to the left side of Plaintiff's rib cage and activated the switch. Normally, when a stun gun is applied to an individual that individual will scream like a 'mashed cat' because of the pain. Plaintiff did not respond verbally to the stun gun nor did he stop struggling and kicking his feet. So Chaddick 'attempted to light [the Plaintiff] up again.' At this time Roetker realized that the stun gun Chaddick was using was not functioning properly. So Roetker applied the stun gun that he had to the lower portion of one of Plaintiff's buttocks. Roetker activated the switch on the stun gun and held it for a full eight seconds as he was trained. Plaintiff initially 'screamed real loud' and then calmed down and went limp—the normal reaction according to Roetker.

Roetker then asked if anybody had gotten hurt. Chaddick replied that he had gotten kicked in the testicles. So Roetker instructed Chaddick to sit down on a nearby chair. Roetker rolled Plaintiff off of Singleton onto the Plaintiff's stomach. Roetker quickly completed the pat search and then he and the other officers carried Plaintiff to an examination room so that Plaintiff could be examined. Plaintiff was placed on a table and examined by a physician's assistant. Roetker held the stun gun to the Plaintiff and told him not to move during the examination. Plaintiff complied with this command. The physician's assistant stated that the Plaintiff 'checked out fine.' Other than a few marks from the stun gun Plaintiff had no injuries. He was alert and did not appear to be in any pain.

An officer then arrived with leg irons, handcuffs and a waist chain. The leg irons were first placed on the Plaintiff, then the waist chain and the handcuffs. The stun gun was held against the Plaintiff while the shackles were placed on him. Plaintiff was then escorted back to cellhouse three and Roetker returned

to his normal duties and completed a report on the incident."

Based on his evaluation of the witnesses' credibility, the Magistrate concluded that the defendants' actions did not constitute cruel and unusual punishment. Reasoning that "[a] prison guard's use of force against an inmate is 'cruel and unusual' only if it involves 'the unnecessary and wanton infliction of pain,'" the Magistrate concluded that the events of July 13, 1989 were the result of the plaintiff's own actions. (Magistrate's recommendation, at 11–12 (quoting *Sampley v. Ruettgers*, 704 F.2d 491 (10th Cir.1983) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)))). The Magistrate stated:

"The Plaintiff was admittedly creating a disturbance by kicking on a cell door and shouting obscenities. He admitted that he was told up to 50 times to cease his disruptive behavior and he admitted that he did not comply with those commands. The Plaintiff called the officers vulgar names, threatened them and tried to antagonize them into a physical confrontation. As a result of Plaintiff's conduct, regular operations in the infirmary were discontinued. When Plaintiff was instructed to assume a certain position so that the officers could enter the cell he refused to comply. Once the officers got inside of the cell and were attempting to pat search the Plaintiff, he started resisting the search. Plaintiff was taken out of the cell whereupon he and Defendant Singleton ended up on the floor with Plaintiff on top of Singleton. Plaintiff was continually kicking his legs and refusing to cooperate with the officers. He kicked Defendant Chaddick at least twice." (Magistrate's recommendation, at 12).

The Magistrate concluded that the plaintiff could not present any facts demonstrating that any defendant intended to harm the plaintiff or that the force used was unnecessary. The Magistrate also noted that the defendants' actions were reasonable and that "it is actually quite surprising that more force was not utilized against the plaintiff." Further, the plaintiff did not suffer any severe pain or last-

ing injury. The Magistrate also concluded that the plaintiff's allegations of conspiracy were insufficient because he failed to "specifically present facts showing agreement and concerted action." (Magistrate's recommendation, at 12–13 (quoting *Hammond v. Bales,* 843 F.2d 1320, 1323 (10th Cir. 1988)).

It is also noteworthy that the Magistrate commented:

> "It appears that the Plaintiff in this case is attempting to litigate or affect the state criminal charges pending against him by harassing the Defendants and obtaining discovery on those charges.... Absent 'extraordinary', 'special' or 'unusual' circumstances, federal courts are prohibited from interfering in on-going state criminal proceedings. *See Younger v. Harris,* 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971); *Parkhurst v. Wyoming,* 641 F.2d 775, 777 (10th Cir.1981) and *Dolack v. Allenbrand,* 548 F.2d 891, 893–94 (10th Cir.1977). To meet that standard the Plaintiff must be facing a 'great and immediate irreparable injury.' *Younger,* 401 U.S. at 46, [91 S.Ct. at 751.] That a person accused of a crime will have to stand trial on that criminal charge causes no such injury. *Dolack,* 548 F.2d at 894." (Magistrate's recommendation, at 13).

■ Plaintiff's objections are written in a verbose, rambling and incomprehensible style. Despite comprising twenty-one pages of incomprehensible handwritten text, his objections do nothing more than reassert his version of the July 13, 1989 incident. Because the Magistrate had the opportunity to evaluate the plaintiff's and the defendants' credibility during an evidentiary hearing, I find the defendants' version to be the more credible and therefore refuse to accept the plaintiff's version of the facts. For these reasons, I adopt the Magistrate's recommendation.

■ In addition to his objection filed in response to the Magistrate's recommendation to dismiss, the plaintiff has also filed: (1) a Request for Access to Court Tapes (February 5, 1990); (2) a Request for Stenographic Transcript (February 14, 1990); (3) a Request for Access to Hearing Tapes (March 5, 1990); (4) a Notice of Judicial Fraud (March 15, 1990); (5) a Request to File Supplement Pleading (March 15, 1990); (6) a Request for Depositions (March 15, 1990); and (7) a Request for an Order Compelling Answers to Interrogatories. This barrage of motions corroborates the Magistrate's comments that the plaintiff filed this suit in an apparent attempt to obtain discovery in the state criminal proceedings. These motions likewise are denied.

In addition to adopting the Magistrate's recommendation, the following comments are warranted. Since 1986, the plaintiff has filed the following sixteen cases in the United States District Court for the District of Colorado:

| Case No. | Defendant | Disposition |
| --- | --- | --- |
| 85–M–1995 | Iuppa | Dismissed |
| 86–M–163 | Diesslin | Dismissed |
| 86–M–304 | 4th Judicial District | Dismissed |
| 86–M–350 | Diesslin | Dismissed |
| 86–M–360 | El Paso County, Jail | Dismissed |
| 86–M–964 | Iuppa | Dismissed |
| 86–M–965 | Colorado Supreme Court | Dismissed |
| 87–M–1050 | Romer | Dismissed |
| 88–C–1334 | Kautzky | Pending |
| 89–C–63 | Pubanz | Dismissed |
| 89–C–755 | Manspeaker | Dismissed |
| 89–N–820 | State of Colorado | Dismissed |
| 89–C–1272 | Foshee | Dismissed |
| 89–C–1668 | State of Colorado | Dismissed |
| 89–C–1727 | Roetker | Pending |
| 90–N–144 | Johnson | Pending |

Fourteen of these cases, including the instant action, have been dismissed.

Based on my review of the matter before me, and my recent consideration of *Rubins v. Foshee,* Civil Action No. 89–C–1272 (D.Colo.), the petitioner does not appear to be seeking justice or resolution of any viable, legitimate legal dispute. Rather, he is inundating this already over-burdened court with frivolous paper. As I frequently have cautioned attorneys admitted to practice in this State, this court will not tolerate incoherent "shotgun" style pleadings.

Possibly the petitioner may have some legitimate grievance that would justify court intervention and resolution. It is virtually impossible, however, for a court to sift through hundreds of pages of confusing, argumentative allegations in an effort to ascertain whether any of the claims are legitimate. Petitioner's obfuscation of his pleadings with frivolous, meritless and abusive allegations heavily burdens, and in fact all but precludes, any efforts by the court to discern, understand or adjudicate his claims.

As the United States Supreme Court recently noted, it is within the inherent powers of this court to impose appropriate restrictions on abusive *in forma pauperis* litigation. *In re McDonald,* 489 U.S. 180, 109 S.Ct. 993, 103 L.Ed.2d 158 (1989). The Constitution provides no right of access to the courts to prosecute actions that are frivolous or malicious. *Tripati v. Beaman,* 878 F.2d 351, 353 (10th Cir.1989).

*Tripati* recognized that where a litigant's access to the court is restricted, guidelines must be set forth so the litigant is aware of what must be done to obtain the court's permission to file an action. *Id.* at 354. In addition, the restricted litigant is entitled to notice and an opportunity to oppose the court's order before it is imposed. These requirements, however, do not require a hearing attended by the litigant and the litigant's written objections to the court's order will suffice. *Id.*

Based on *Tripati, supra,* I conclude that appropriate sanctions should be imposed against the plaintiff because of his consistent and repeated abuse of the legal system. Plaintiff's access to the courts will be restricted and he is ordered to have future complaints or petitions "screened" by the Department of Corrections Legal Access Attorney before being permitted to file them. In addition, the petitioner is enjoined from raising the same or similar allegations in subsequent actions. Petitioner further is restricted to filing one action per year unless he claims he is about to be subjected to immediate physical harm. Petitioner may be cited for contempt, and assessed costs and attorneys' fees if he violates the court's order.

I have reviewed the Magistrate's recommendation, the plaintiff objections and the entire file. The recommendation appears to be supported by the law and the facts, and therefore I adopt it as the order of this court.

Accordingly, IT IS ORDERED that:

(1) Plaintiff's objection to the Magistrate's recommendation is overruled;

(2) Plaintiff's motions for

(a) a Request for Access to Court Tapes;

(b) a Request for Stenographic Transcript;

(c) a Request for Access to Hearing Tapes;

(d) a Notice of Judicial Fraud;

(e) a Request to File Supplement Pleading;

(f) a Request for Depositions; and

(g) a Request for an Order Compelling Answers to Interrogatories are denied;

(3) Plaintiff's complaint and action are dismissed;

(4) Plaintiff's access to the courts shall be restricted in the following manner;

a. Plaintiff's future petitions and complaints shall be screened before fil-

ing by the Department of Corrections Legal Access Attorney;

b. Plaintiff is enjoined and prohibited from raising the same or similar allegations in subsequent actions; and

c. Plaintiff may file only one action per year unless he claims immediate physical harm;

(5) Any violation of this order by the plaintiff may be punished by contempt proceedings;

(6) Plaintiff shall bear all costs of all parties to this litigation.