**Tyrone SHELTON, Plaintiff,**

v.

**Ronald ANGELONE, et al., Defendants.**

**No. 7:99CV00750.**

United States District Court, W.D. Virginia, Roanoke Division.

Jan. 23, 2002.

See also, 148 F.Supp.2d 670.

---

Tyrone Shelton, Waverly, VA, pro se.

Christopher Garrett Hill, Office of Attorney General, Richmond, VA, for Defendants.

Heather M. Kofron, David Ernest McCammon, Wright, Robinson, Osthimer & Tatum, Richmond, VA, for M. Mullins.

### MEMORANDUM OPINION

SARGENT, United States Magistrate Judge.

This case is before the court on the defendants' motions for summary judgment, (Docket Item Nos. 36, 97), and the plaintiff's motion for sanctions, (Docket Item No. 106). Based on my review of the evidence provided and the arguments and representations of the parties, and for the reasons set forth below, I will grant the defendants' motions for summary judgment in part and I will deny the motions in part. I also will deny the plaintiff's motion for sanctions.

### I. Facts

The plaintiff, Tyrone Shelton, a prisoner who was previously incarcerated in Red Onion State Prison, ("Red Onion"), in Wise County, Virginia, brings this action against the defendants, Virginia Department of Corrections Director Ronald Angelone, Deputy Director Gene M. Johnson, Chief of Operations Gary Bass, Regional Director Richard A. Young, former Red Onion Warden George Deeds, Red Onion Assistant Warden of Programs Yvonne Elswick, Red Onion Operations Officer S. Shortridge, Treatment Program Supervisor J. Bentley, Nurse M. Mullins and correctional officers Major R. Rowlette, Captain L. Fleming, Captain D. Taylor and Sergeant Pientka.[1] In his complaint, Shelton seeks damages under 42 U.S.C. § 1983, alleging that the defendants subjected him to the excessive use of force, denied him access to medical treatment and violated his due process rights in changing his custody classification in violation of the Eighth and Fourteenth Amendments to the United States Constitution. (Complaint, (Docket Item No. 2), at 9–22.) Shelton is seeking declaratory, monetary and injunctive relief. (Complaint at 22–24.) He is suing the defendants in both their official and individual capacities. (Complaint at 4–8.)

Through his sworn complaint and various affidavits, Shelton alleges that on September 21, 1998, he was beaten and repeatedly shocked with an electric stun gun by Fleming, Taylor and Pientka during his intake at Red Onion. (Complaint at 9.) Shelton claims that this assault occurred without any justification and while he was in leg irons and handcuffs attached to a waistchain. (Complaint at 9.)

Shelton also alleges that Elswick and Bentley violated his due process rights by reclassifying his security status without affording him proper procedural protections in violation of existing reclassification regulations and by the use of false information. (Complaint at 11–12.) Shelton further alleges that Young, Bass, Shortridge,

---

1. The claims against Mullins and Deeds have been dismissed by previous order of the court.

Johnson and Angelone violated his due process rights in that, once they were made aware of the improper classification, they took no action to correct Elswick's and Bentley's actions. (Complaint at 14–15, 18–22.)

Shelton also claims that Rowlette refused to provide adequate medical treatment in that he would not allow Shelton to be provided with a special pair of tinted eyeglasses. (Complaint at 16–17.) Shelton claims that excessively bright fluorescent lighting in his cell led to a "serious twitching condition" in his left eye, which, in turn, led to difficulty sleeping, stress, headaches and weight loss. (Complaint at 15–16.)

The defendants do not dispute that Shelton was an inmate at Red Onion. (Defendant's Memorandum In Support Of Their Motion For Summary Judgment, ("Defendants' Brief"), (Docket Item No. 37), at 1.) The defendants also do not dispute that Shelton was received at Red Onion on September 21, 1998, nor that he was shocked with an electronic Ultron II stun gun by Taylor. (Defendants' Brief at 4; Affidavit of D. Taylor, ("Taylor Affidavit"), (Exhibit A to Docket Item No. 37), at 2.) The defendants do dispute, however, that Shelton was physically assaulted during the intake process. (Defendants' Brief at 4; Taylor Affidavit at 3.)

## II. Analysis

As stated above, this matter is before the court on the defendants' motion for summary judgment. The defendants argue that summary judgment should be entered in their favor on the following grounds:

1. Plaintiff is suing the defendants in their official capacities, and the defendants are immune from suit in their official capacities for damages;

2. Plaintiff's claim of excessive force does not show an infliction of unnecessary and wanton pain and suffering;

3. Plaintiff does not allege that defendants Angelone, Young and Johnson had any direct participation in the incident of September 21, 1998, or in the alleged deprivation of his due process rights;

4. Plaintiff was afforded procedural due process with regard to his security classification;

5. Plaintiff suffered no undue hardship as a result of the alleged violation of his due process rights;

6. Plaintiff was not denied adequate medical treatment by the defendants; and

7. The defendants are entitled to qualified immunity from the claims brought against them in their individual capacities.

(Defendants' Brief at 2–8; Defendant's Memorandum In Support Of Their Supplemental Motion For Summary Judgment, ("Defendants' Second Brief"), (Docket Item No. 98), at 3–5.)

Pursuant to Federal Rule of Civil Procedure 56(c), the court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990) (en banc), *cert. denied,* 498

U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); and *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Inc.*, 475 U.S. at 587, 106 S.Ct. 1348; *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir.1995); *Miltier v. Beorn*, 896 F.2d 848, 850 (4th Cir.1990); *Ross*, 759 F.2d at 364; *Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir.1980). In other words, the nonmoving party is entitled "to have the credibility of his evidence as forecast assumed." *Miller*, 913 F.2d at 1087 (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979)). Therefore, in reviewing the defendants' motion, the court must view the facts and inferences in the light most favorable to the plaintiff.

■ With regard to the defendants' first argument, that the defendants are not subject to a suit in their official capacity for monetary damages, I agree. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The plaintiff's complaint, however, clearly states that he is suing each defendant in both their official and individual capacities. (Complaint at 4–8.) Furthermore, the defendants' own brief admits that they are being sued in this case in both their official and individual capacities. (Defendants' Brief at 2.) Both the Supreme Court and the Fourth Circuit have held that state officials, sued in their individual capacities, are "persons" within the mean-

ing of 42 U.S.C. § 1983, and are not absolutely immune from personal liability under § 1983 solely by virtue of the official nature of their acts. *See Hafer v. Melo*, 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *White v. Gregory*, 1 F.3d 267, 269–70 (4th Cir.1993).

■ As to the defendants' second argument, the specific constitutional right at issue is the Eighth Amendment prohibition against the infliction of "cruel and unusual punishment." U.S. CONST.AMEND. VIII. This amendment not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir.1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian*, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams*, 77 F.3d at 761 (citing *Wilson v. Seiter*, 501 U.S. 294, 302, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).

> Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component).

*Williams*, 77 F.3d at 761.

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "mali-

ciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21, 106 S.Ct. 1078. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7, 112 S.Ct. 995. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1) the need for application of force;

2) the relationship between that need and the amount of force used;

3) the threat reasonably perceived by the responsible officials; and

4) any efforts made to temper the severity of a forceful response.

*Williams*, 77 F.3d at 762 (citing *Whitley*, 475 U.S. at 321, 106 S.Ct. 1078).

In this case, Shelton has presented evidence that he was beaten and shocked repeatedly with a stun gun while in leg irons and handcuffs without justification. Therefore, I find that, should a jury believe Shelton's testimony, this evidence would support a finding that these officials applied force "maliciously and sadistically."

■ Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights, however. *See Hudson*, 503 U.S. at 9, 112 S.Ct. 995 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973)). To meet the objective component in an excessive force case, an inmate must show that he suffered more than de minimis pain or injury. *See Williams*, 77 F.3d at 761(citing *Hudson*, 503 U.S. at 9–10, 112 S.Ct. 995). Since mankind has devised some tortures that leave no lasting physical evidence of injury, the courts have recognized that the objective component can be met by "the pain itself" even if the inmate suffers no "enduring injury." *See Williams*, 77 F.3d at 762 (quoting *Norman v. Taylor*, 25 F.3d 1259, 1264 n. 4 (4th Cir.1994) (en banc)). "A prisoner ... asserting malicious and sadistic use of force need not show that such force caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action.... All that is necessary is proof of more than de minimis pain or injury." *Williams*, 77 F.3d at 761 (citation omitted).

In *Hickey v. Reeder*, 12 F.3d 754 (8th Cir.1993), the Eighth Circuit held that the use of a stun gun on an inmate without legitimate reason would be sufficient to meet the objective component of the excessive force inquiry. The Eighth Circuit stated:

... [A] stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless. This is exactly the sort of torment without marks ... which, if inflicted without legitimate reason, supports the Eighth Amendment's objective component.

*Hickey*, 12 F.3d at 757. In this case, the defendants admit that Taylor applied a stun gun to Shelton. The defendants argue, however, that plaintiff suffered no or only de minimis injuries, which are not sufficient to state a claim. *See Norman v. Taylor*, 25 F.3d 1259 (4th Cir.1994).

■ In this case, Shelton claims that he was repeatedly shocked with a stun gun without justification while restrained in leg irons and handcuffs. I find that such conduct, if it occurred, would be "repugnant to the conscience of mankind," *Whitley*, 475 U.S. at 327, 106 S.Ct. 1078, and would not require proof of any permanent, serious physical effect. *See Velasco v. Head*, 166 F.Supp.2d 1100, 1104 (W.D.Va.2000) (use of stun gun on prisoner may amount to cruel and unusual punishment without proof of permanent, serious injuries);

*Hudson,* 503 U.S. at 9–10, 112 S.Ct. 995; *Norman,* 25 F.3d at 1264, n. 4; *see also Hickey,* 12 F.3d at 758–59 (use of stun gun to compel compliance with correction officer's order to sweep cell is violation of inmate's Eighth Amendment right to be free from cruel and unusual punishment); *Caldwell v. Moore,* 968 F.2d 595, 600–01 (6th Cir.1992) (use of stun gun is not a per se violation of Eighth Amendment, liability must be determined on the facts of each case); *Michenfelder v. Sumner,* 860 F.2d 328, 336 (9th Cir.1988) (a finding that use of a stun gun is not per se unconstitutional does not validate its unrestricted use, the appropriateness of its use must be determined by the facts and circumstances of each case); *but see Rubins v. Roetker,* 737 F.Supp. 1140, 1142–44 (D.Colo.1990) (use of stun gun to subdue disruptive inmate did not constitute cruel and unusual punishment). Thus, I find that the evidence is sufficient to defeat the defendants' motion for summary judgment on this ground.

■ With regard to the defendants' third argument, I agree that the plaintiff's claims against defendants Angelone, Young and Johnson do not show that any of these defendants had any direct participation in the incident of September 21, 1998. Seeking to impose liability based upon a respondeat superior theory is barred under 42 U.S.C. § 1983. *See Dillon v. Murray,* 853 F.Supp. 199, 204 (W.D.Va.1994). However, if a plaintiff does not claim a direct involvement on the part of a defendant in the alleged violation, he may still show that the constitutional deprivation was caused by the exercise of a policy or custom for which the defendant was responsible. *See Dillon,* 853 F.Supp. at 204; *see also Fisher v. Washington Metro. Area Transit Auth.,* 690 F.2d 1133, 1143 (4th Cir.1982).

The Complaint in this case contains no allegation that either Angelone, Johnson or Young was responsible for developing the use of force policy in place at Red Onion at the time of the alleged incident. In his complaint, Shelton describes Angelone's duties as the Director of the Virginia Department of Corrections to include supervising and managing the Department of Corrections, as well as enforcing the laws and regulations governing penal institutions within the Commonwealth and overseeing supervision of the same. (Complaint at 3–4.) Similarly, Shelton describes Johnson's duties as the Deputy Director of the Virginia Department of Corrections to include supervising, managing and overseeing enforcement of the laws and regulations governing penal institutions within the Commonwealth. (Complaint at 4.) Shelton describes Young's duties as the Regional Director for the Western Division of Virginia to include overseeing and enforcing the rules, regulations and laws at Red Onion. (Complaint at 5.) Based on Shelton's failure to allege or to produce evidence that either Angelone, Johnson or Young was responsible for developing the use of force policy in existence at the time of the alleged incident, I will grant defendants' summary judgment motion on this ground.

■ Nevertheless, supervisory liability may be imposed upon an individual for his "tacit authorization" of the misconduct of a subordinate, such action being a causative factor in the resulting injuries. *See Dillon,* 853 F.Supp. at 204. When a plaintiff claims it was a supervisor's inaction which caused the constitutional injury, that inaction must rise to the level of reckless disregard, gross negligence or deliberate indifference in order to be actionable at law. *See Dillon,* 853 F.Supp. at 204. The Fourth Circuit has established a three-part test by which a supervisor may be held liable for the actions of a subordinate: (1) the supervisor must have actual or con-

structive knowledge that the subordinate was engaged in conduct posing a pervasive and unreasonable risk of constitutional injury; (2) the supervisor's response to the conduct must be so inadequate so as to constitute deliberate indifference; and (3) the plaintiff must establish an affirmative link between the supervisor's inaction and the resulting injury. *See Dillon,* 853 F.Supp. at 205. In order to show that a subordinate's conduct posed a pervasive and unreasonable risk of harm, the plaintiff must produce evidence "that the conduct is widespread, or at least has been used on several different occasions." *See Dillon,* 853 F.Supp. at 205 (quoting *Slakan v. Porter,* 737 F.2d 368, 373–74 (4th Cir. 1984)). In order to show the supervisor's deliberate indifference, the plaintiff must not rely on a single, isolated incident but must show "continued inaction in the face of documented widespread abuses." *See Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994) (quoting *Slakan,* 737 F.2d at 373).

■ In this case, Shelton has presented evidence of inmate grievances and formal complaints dating from the time that Red Onion began receiving inmates in late August 1998 through October 15, 1998. This evidence shows that there were six formal inmate complaints alleging the excessive use of force by Red Onion correctional officers during this period of time. Four of these complaints involved the use of stun guns. Although seven reported instances of excessive force might not initially appear to constitute widespread abuse, it could be construed as such in light of the short time period during which they were reported. Assuming that Shelton has produced evidence that the defendants' alleged constitutional violations were widespread, thereby showing that Angelone, Johnson and Young had actual or constructive knowledge that their subordinates were engaged in conduct posing a pervasive and unreasonable risk of constitutional injury, and, assuming that Shelton can show the requisite "continued inaction in the face of documented widespread abuses," thereby proving deliberate indifference on the part of Angelone, Johnson and Young, Shelton has not provided any evidence establishing an affirmative link between the defendants' inaction and his alleged constitutional injuries. In fact, Shelton has failed to even allege that there is a direct causal link between the inaction of Angelone, Johnson and Young and the alleged resulting constitutional injury. Therefore, Shelton has failed to satisfy the three-part test for supervisory liability. That being the case, I will grant summary judgment in favor of defendants Angelone, Johnson and Young, and I will dismiss Shelton's claims against them.

■ With regard to defendants' fourth argument, that Shelton was afforded procedural due process with regard to his security classification, I agree. The initial inquiry in any due process claim is whether the plaintiff has demonstrated that he has been deprived of a protected liberty interest by the state. *See Sandin v. Conner,* 515 U.S. 472, 477–78, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Only if this threshold requirement is met do the protections of procedural due process come into play. *See Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); *Sandin,* 515 U.S. at 477, 115 S.Ct. 2293. To obtain a protectable right, a person must have more than an abstract desire or a unilateral expectation of it. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, he must have a legitimate claim of entitlement to it. *See Board of Regents of State Colleges,* 408 U.S. at 577, 92 S.Ct. 2701. In *Hewitt v. Helms,* the

Supreme Court stated that "[L]anguage of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... [may give rise to a due process right to have the procedures employed]." 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Although the Supreme Court in *Sandin* recognized, that, under certain circumstances, states, through their correctional policies, may create liberty interests for prisoners which are protected by the due process clause, the Court clarified this holding by finding that these interests generally will be limited "to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–84, 115 S.Ct. 2293; *see also Garrett v. Angelone*, 940 F.Supp. 933, 943 (W.D.Va.1996) (prison regulation creates a liberty interest and implicates due process protections only where the regulation imposes upon the inmate conditions which dramatically depart from the expected conditions of his sentence). This new test imposes an additional hurdle for inmates to overcome to establish a constitutional right to procedural due process protection.

The Court in *Sandin* held that liberty interests justifying procedural due process protections can be created in only two situations. *See Sandin*, 515 U.S. at 484, 486–87, 115 S.Ct. 2293. First, when, independent of state law, a deprivation exceeds the prisoner's sentence in an unexpected manner. *See Sandin*, 515 U.S. at 486–87, 115 S.Ct. 2293. Second, when state law of a mandatory character imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293. Therefore, the Court has held that a determination must be made regarding whether the conditions suffered were expected within the contour of the actual sentence imposed. *See Sandin*, 515 U.S. at 484, 115 S.Ct. 2293. Thus, "a state does not violate an individual's federal constitutional right to procedural due process merely by deviating from its own established procedures." *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 649 (D.C.Cir.1987).

In Virginia, the Institutional Classification Authority, ("ICA"), makes determinations regarding an inmate's security level. (Affidavit of Y. Elswick, ("Elswick Affidavit"), (Exhibit B to Docket Item No. 37), at 1.) Recommendations of the ICA are based on relevant information provided at an administrative hearing. (Elswick Affidavit at 1.) An inmate's eligibility for a specific security level is determined by the use of an approved scoring instrument. (Elswick Affidavit at 1–2.) The Central Classification Board, ("CCB"), reviews the recommendations made by the ICA and renders a final decision regarding an inmate's status and assignment. (Elswick Affidavit at 2.) On February 23, 1999, Shelton received a total of 36 points on the classification scoring instrument. (Enclosure C to Elswick Affidavit). A score of 34 or more points results in placement in security level 6, the highest security level. (Enclosure C to Elswick Affidavit). Shelton's score was based on various factors, including an assault during the previous 24 months, his history of institutional violence, the severity of his current offense and his institutional disciplinary record. (Enclosure C to Elswick Affidavit). Then–Warden Deeds approved the ICA recommendation. (Enclosure C to Elswick Affidavit). Previously, Virginia prisons, including Red Onion, had utilized only three security classifications: A, B and C.

Various courts have held that, in general, inmates do not have a liberty interest in a particular security classification. *See Drummer v. Luttrell*, 75 F.Supp.2d 796

(W.D.Tenn.1999); *Harrison v. Raney,* 837 F.Supp. 875 (W.D.Tenn.1993); *Sandefur v. Lewis,* 937 F.Supp. 890 (D.Ariz.1996). Similarly, the court in *Templeman v. Gunter,* 16 F.3d 367, 369 (10th Cir.1994), held that a change in classification does not create a liberty interest because an inmate is not entitled to a particular degree of liberty while incarcerated. Essentially, given a valid conviction, a criminal defendant has been constitutionally deprived of his liberty to the extent that a state may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution. *See Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

Clearly, being reclassified into a higher security level does not exceed a prisoner's sentence in an unexpected manner. The length of a prisoner's sentence is not changed by a mere security reclassification. Furthermore, it is foreseeable, and even expected, that a prisoner's classification might change based upon his conduct while in prison. Therefore, reclassification into a different security level is simply an incident of prison life.

Although Shelton received a score of 29 in 1998, when the previous classification system was in place, I cannot determine from the record in which security level that would have placed Shelton. That being the case, I cannot assess whether Shelton's placement in security level 6 constituted an "atypical and significant hardship on [Shelton] in relation to the ordinary incidents of prison life." Therefore, I must reject defendants' fifth argument, that summary judgment should be entered in their favor on Shelton's due process claims because he suffered no undue hardship.

Nonetheless, assuming that Shelton did suffer an atypical and significant hardship, and, therefore, did have a protectable liberty interest in his security classification, I find that he was afforded adequate procedural due process. First, Shelton was given the opportunity to be heard, as well as the opportunity to appeal the initial ICA decision. Furthermore, Shelton's security classification was based upon an objective scoring system which takes into consideration various factors, including the nature of his crime and his history of institutional violence. Shelton's score of 36 was squarely within the point range for a level 6 security classification. Based on the above, I find that Shelton was not deprived of procedural due process as a result of classification at a higher security level. Therefore, I will grant the defendants' summary judgment motion on this ground, and I will dismiss the plaintiff's claim against defendants Elswick, Bentley, Young, Bass, Shortridge, Johnson and Angelone.

■ With regard to defendants' sixth argument, that Shelton was not denied adequate medical treatment, I also agree. In *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court extended the reach of the Eighth Amendment to create a constitutional obligation on the part of the government to provide prisoners adequate medical care. In order for a prisoner to sustain an Eighth Amendment claim for deliberate indifference to serious medical needs, a prisoner must satisfy a two-prong test, including an objective component, as well as a subjective component. The objective component is met when the prisoner proves that his medical need is serious. *See Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The subjective component is met when a prison official acts with deliberate indifference to a prisoner's serious medical need. *See Farmer v. Brennan,* 511 U.S. 825, 837–41,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prisoner must carry his burden of proof on both of these elements to establish a successful claim of deliberate indifference. *See Helling v. McKinney*, 509 U.S. 25, 30, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). A medical need is "serious" if it is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Cox v. District of Columbia*, 834 F.Supp. 439, 441 (D.D.C.1992)

Here, Shelton complained of sensitivity to the fluorescent lighting in his cell, which resulted in a "serious twitching condition" in his left eye, as well as difficulty sleeping, which led to stress and weight loss. (Complaint at 16.) Shelton saw the institutional physician who recommended glasses with shields and sides. Nevertheless, Shelton alleges that he was not provided such glasses because, according to Defendant Rowlette, they would create a security risk. (Complaint at 17.) W. Baker, the Director of Nursing at Red Onion, testified that Shelton was evaluated by Dr. Bunker on May 6, 1999, for complaints of eye twitching. (Affidavit of W. Baker, ("Baker Affidavit"), (Exhibit C to Docket Item No. 37), at 1.) At that time, Dr. Bunker ordered eyeglasses with shields and sides. (Baker Affidavit at 1.) However, on September 23, 1999, when Rowlette informed Dr. Bunker that such eyeglasses would pose a security threat, Dr. Bunker agreed. (Baker Affidavit at 1.) On September 30, 1999, C. Owens, an eye doctor, ordered eyeglasses with medium tint and gray solid side shields. (Baker Affidavit at 2.) It is noted in the record that Shelton refused to sign the appropriate form at that time to receive these eyeglasses. (Baker Affidavit at 2.)

Rowlette, the former Chief of Security at Red Onion, has offered evidence that all personal property owned by inmates housed at Red Onion is examined and regulated to maintain safety, security and order. (Affidavit of R. Rowlette, ("Rowlette Affidavit"), (Exhibit D to Docket Item No. 37), at 1.) Rowlette further testified that all personal property must be specifically authorized and approved for possession by the inmate. (Rowlette Affidavit at 1.) Rowlette testified that all non-prescription sunglasses are prohibited unless deemed medically necessary by a physician. (Rowlette Affidavit at 2.) Furthermore, Rowlette testified that all approved eyeglasses must meet the security criteria standards. (Rowlette Affidavit at 2.) If those standards are not met, the institution will issue eyeglasses for the inmate. (Rowlette Affidavit at 2.) Rowlette testified that sunglasses are deemed a security risk because inmates can use them as a weapon or use them to conceal or mask their identity. (Rowlette Affidavit at 2.) Rowlette testified that both he and Dr. Bunker agreed that such eyeglasses with shields and sides constituted a security risk. (Rowlette Affidavit at 2.) Rowlette further testified that he understood that Dr. Bunker ordered the special eyeglasses more for convenience to Shelton than as a matter of medical necessity. (Rowlette Affidavit at 2.)

Based on the above, I find that Shelton has not produced evidence to satisfy either prong of the two-prong test under the Eighth Amendment. Specifically, Shelton has produced no evidence that his sensitivity to the fluorescent lighting in his cell was a serious medical need. No physician who examined Shelton regarding his eye condition mandated treatment for it, nor was it "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Thus, Shelton has not produced evidence to satisfy the objective component of the two-prong test. Without evidence that he suffered from a serious medical need, Shelton cannot show that

any of the defendants acted with deliberate indifference to this need. That being the case, Shelton cannot satisfy the subjective component of the two-prong test. Therefore, I will grant the defendants' summary judgment motion on this ground.

Furthermore, with regard to the defendants' seventh argument, government officials, including correctional officers, may have qualified immunity from civil liability for performing discretionary functions only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Whether a prison guard is shielded from liability for his conduct under this doctrine depends upon whether a reasonable prison guard possessing the same information could have believed his conduct to be lawful." *Johnson v. Garraghty*, 57 F.Supp.2d 321, 329 (E.D.Va.1999) (citing *Rainey v. Conerly*, 973 F.2d 321, 323 (4th Cir.1992)). The Fourth Circuit has set out a three-step inquiry for determining whether the defense of qualified immunity is applicable in a particular case. *See Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992). Under this inquiry a court must identify the specific constitutional right allegedly violated, inquire whether the right was clearly established at the time of the alleged violation and then determine whether a reasonable person in that official's position would have known that his conduct violated that right. *See Pritchett*, 973 F.2d at 312.

In this case, the only remaining constitutional right at issue is the Eighth Amendment prohibition against the infliction of "cruel and unusual punishment." U.S. CONST. AMEND. VIII. As stated above, this prohibition not only outlaws excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams*, 77 F.3d at 761. The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson*, 503 U.S. at 5, 112 S.Ct. 995; *Whitley*, 475 U.S. at 319, 106 S.Ct. 1078. In this case, Shelton has presented evidence that defendants Fleming, Taylor and Pientka assaulted him for no reason. The defendants have presented evidence to the contrary. Nevertheless, if Shelton's version of the facts are true, a reasonable person in the defendants' position would have known that their actions violated Shelton's right to be free from cruel and unusual punishment. Furthermore, the Fourth Circuit has held that when the parties' versions of the underlying facts are in direct contradiction, resolution of the qualified immunity issue is inappropriate at the summary judgment stage. *See Rainey v. Conerly*, 973 F.2d 321, 323 (4th Cir.1992). Therefore, I will deny the defendants' motion for summary judgment on this ground.

With regard to Shelton's motion for sanctions, I find that the defendants have fully complied with this court's order dated July 31, 2001, ordering them to provide Shelton and this court certain documents. Therefore, I will deny Shelton's motion for sanctions.

Based on the above-stated reasons, an appropriate order dismissing all of Shelton's claims except for his claim for use of excessive force against defendants Fleming, Taylor and Pientka will be entered.