**Robert Allen BANE Plaintiff,**

**v.**

**VIRGINIA DEPARTMENT OF CORRECTIONS, et al. Defendants.**

**No. 7:01CV00987.**

United States District Court, W.D. Virginia, Roanoke Division.

June 6, 2003.

Robert Allen Bane, Waverly, VA, pro se.

Pamela Anne Sargent, Office of the Attorney General, Richmond, VA, William H. Lindsey, PC, Salem, VA, John Dickens Eure, Joseph Aubrey Matthews, Jr., John-

son, Ayers & Matthews, Roanoke, VA, Timothy Edmond Kirtner, Gary Clay Hancock, Gilmer, Sadler, Ingram, Sutherland & Hutton, Pulaski, VA, for Defendants.

## MEMORANDUM OPINION

TURK, Senior District Judge.

This matter is before the Court on the Virginia Department of Correction's ("VDOC's") Motion to Dismiss challenging the constitutionality of section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the motions for summary judgment filed by Defendants Hockett, Anderson, and Short pursuant to Rule 56 of the Federal Rules of Civil Procedure. In a decision dated May 22, 2002, the Court dismissed the Plaintiff's claims against the individual defendants under the Rehabilitation Act and the claims against the VDOC under the Eighth Amendment, but upheld the Plaintiff's Eighth Amendment claims against the individual defendants. The VDOC's Motion to Dismiss the Plaintiff's Rehabilitation Act claim was not decided, as the Court took the VDOC's challenge to the constitutionality of the Rehabilitation Act under advisement.

Notice of the constitutional challenge to the Rehabilitation Act has been provided to the Attorney General of the United States pursuant to Rule 24(c). As more than sixty days have passed since the issuance of the Rule 24(c) notice, the VDOC's Motion to Dismiss is ripe for resolution.

### I

The Plaintiff, Robert Allen Bane, was an inmate at Wallens Ridge State Prison ("Wallens Ridge") when the conduct relevant to this lawsuit allegedly took place. Plaintiff suffers from what he describes as a "chronically unstable right shoulder due to ligament and nerve damage." To accommodate this injury, the medical depart-

ment at Wallens Ridge issued Plaintiff a medical notice on May 30, 2000, which stated that the Plaintiff was to be cuffed with his hands in front when handcuffs were required. This so-called "cuff front pass" did not specify an end date, instead stating that it would be valid for an "indefinite" period of time. The custom at Wallens Ridge was to post these medical passes on inmates' cell doors.

On September 3, 2001, Wallens Ridge personnel, supervised by Sergeant Marvin Short ("Short"), conducted a search of the Plaintiff's cell. Plaintiff claims that, at the time of the search, the "cuff front pass" was posted on his cell door, and that Short and Sergeant David Anderson ("Anderson") saw and read the medical document. Plaintiff then claims that Short told him that the waiver was not valid and Anderson threw the document in the trash. After Plaintiff objected to this action, Short called his supervisor, Captain Isaac Hockett ("Hockett"). Plaintiff claims that Short called to request instructions on the proper course of behavior in response to the waiver. After discussing the matter with Hockett, Short allegedly told the Plaintiff that Hockett gave an order to cuff

the Plaintiff's arms behind his back despite the waiver.

Plaintiff alleges that Short then forced his arms behind his back and handcuffed him, leaving him in this position for a period of forty-five minutes. Upon completion of the cell search, the Plaintiff complained of pain in his right shoulder, as he claimed that it had been dislocated when he was handcuffed. The Plaintiff submitted a written grievance in response to the incident, and A.P. Harvey, the Assistant Warden of Operations at Wallens Ridge, in a memorandum addressed to the Plaintiff on September 19, 2001, assured the Plaintiff that a copy of the waiver would be posted on his cell door. However, on September 27, 2001, the Plaintiff alleges that Anderson again removed the order from his cell door. The Plaintiff submitted another written grievance, which S.K. Young, the Warden of Operations at Wallens Ridge, considered to be "founded," but not a violation of the Plaintiff's constitutional rights.

As a result of the denials of his requests for compensation and adequate punishment of those involved, the Plaintiff filed suit under 42 U.S.C. § 1983 and section 504 of the Rehabilitation Act[1], seeking

---

1. Plaintiff's section 1983 claims allege violations of his Eighth Amendment rights and are separate from his discrimination claims under the Rehabilitation Act. If the Plaintiff's 1983 claims were merely another means of pleading a violation of his rights under the Rehabilitation Act, then the Court would be required to dismiss the 1983 claims. See Zombro v. Baltimore City Police Dep't, 868 F.2d 1364 (4th Cir.1989) (holding that the Age Discrimination in Employment Act preempts a 1983 claim for age discrimination); Shepard v. Irving, 204 F.Supp.2d 902 (E.D.Va.2002) (holding that the Rehabilitation Act cannot be enforced in a 1983 claim); see also Holbrook v. City of Alpharetta, 112 F.3d 1522 (11th Cir.1997) (claims for discrimination on the basis of disability under 1983 are preempted by the ADA and the Rehabilitation Act). However, the Plaintiff's 1983 claims

are unrelated to the Rehabilitation Act, as the Plaintiff's Eighth Amendment rights exist independently of his status as a disabled individual. When a Plaintiff's 1983 claims assert rights that cannot be protected under the Rehabilitation Act, courts have allowed 1983 claims and Rehabilitation Act claims to coexist. See Smith v. Barton, 914 F.2d 1330, 1335 (9th Cir.1990) ("While there is disagreement over whether Congress intended to foreclose section 1983 claims that could have been brought under the Rehabilitation Act, there is no indication that Congress intended to foreclose section 1983 claims that are unrelated to handicap discrimination."); Paegle v. Dep't of the Interior, 813 F.Supp. 61 (D.D.C.1993) (holding that the key inquiry in determining whether to hold that the Rehabilitation Act preempts a 1983 claim is whether the claim addresses discrimination against the plaintiff

damages in the amount of $7,000 for his pain and suffering.

## II

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, forbids discrimination against the disabled in programs receiving federal funds: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." *Id.* § 794(a). Courts have interpreted this language broadly, recognizing that Congress passed the Rehabilitation Act with the purpose of eliminating discrimination against the handicapped in programs and activities receiving federal financial assistance. *See, e.g., Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). As part of this broad interpretation, the Supreme Court has held section 504 of the Rehabilitation Act to require "reasonable accommodations" in a particular program or activity receiving federal financial assistance in order to ensure "meaningful access" to the program. *See Alexander,* 469 U.S. at 301, 105 S.Ct. at 720.

The Rehabilitation Act defines "program or activity" to include every state or local government entity that receives federal financial assistance. 29 U.S.C. § 794(b)(1)(B). The Fourth Circuit was initially reluctant to include state prisons within the meaning of this phrase. *See Amos v. Maryland Dep't of Pub. Safety and Corr. Services (Amos I),* 126 F.3d 589 (4th Cir.1997); *Torcasio v. Murray,* 57 F.3d 1340 (4th Cir.1995). However, in a 1998 ruling, the Supreme Court removed all doubt on this issue by expressly stating that the language of the Rehabilitation Act includes state prisons receiving federal funds. *Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (holding that the language of the ADA, which is the identical language used in the Rehabilitation Act, includes state prisons). Courts in the Fourth Circuit have recognized the Supreme Court's ruling in *Yeskey* and have since applied the mandates of the Rehabilitation Act to state prisons. *See, e.g., Amos v. Maryland Dep't of Pub. Safety and Corr. Services (Amos II),* 178 F.3d 212 (4th Cir.1999); *McIntyre v. Robinson,* 126 F.Supp.2d 394, 407–08 (D.Md.2000); *Scott v. Kelly,* 107 F.Supp.2d 706, 710 (E.D.Va. 2000).

The Virginia Department of Corrections has made three challenges in its Motion to Dismiss the Plaintiff's Rehabilitation Act claims. First, the VDOC contends that there is no private right of action to enforce the Act against an agency of the Commonwealth. Second, the VDOC argues that it maintains absolute sovereign immunity from suit, that the Commonwealth has not consented to waive this immunity by receiving federal funds, and that Congress cannot constitutionally abrogate the Commonwealth's sovereign immunity under the Rehabilitation Act. Finally, even if the Act validly removes the Commonwealth's immunity from suit, the VDOC claims that the Act would then violate the Tenth Amendment to the United States Constitution.

The VDOC has not bothered to discuss whether the Plaintiff has stated a valid claim under the Rehabilitation Act, opting

as a handicapped individual); *see also McIntyre v. Robinson,* 126 F.Supp.2d 394 (D.Md. 2000) (hearing an inmate's Eighth Amendment claim under section 1983 and the in-

mate's Rehabilitation Act claim despite both claims having arisen from the identical set of facts).

instead to challenge the constitutionality of the Act. This Court does not have the luxury of such a choice, as "the 'great gravity and delicacy' " that is required in passing judgment on the constitutionality of an act of Congress requires the Court to determine the absolute necessity of reaching a constitutional question before deciding it. *See Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 345–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936). Thus, before reaching the merits of the VDOC's constitutional challenges to the Rehabilitation Act, the Court must decide on the limited facts before it whether the Plaintiff states a valid claim under the Act.

## III

■ To establish a violation of the Rehabilitation Act, a plaintiff must prove that he or she: (1) is a qualified individual with a disability; (2) is otherwise qualified for the benefit of programs, services, or activities in question; and (3) was excluded from the same due to discrimination on account of the disability. *See Doe v. Univ. of Maryland Med. Sys. Corp.,* 50 F.3d 1261, 1265 (4th Cir.1995); *McIntyre v. Robinson,* 126 F.Supp.2d at 408.

■ In defining what constitutes a qualifying disability, the Rehabilitation Act cites to the definition of disability found in 29 U.S.C. § 705(20). 29 U.S.C. § 794(a). This section defines an "individual with a disability" as any person who "(i) has a physical or mental impairment, which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." The Plaintiff in the present case suffers from what he describes as a "chronically unstable right shoulder due to ligament and nerve damage." (Pl.'s Aff. at 1). This injury has eliminated any range of motion in Plaintiff's right shoulder, and he is forced to wear a sling at all times except when showering. (Pl.'s Aff. at 2) While the Plaintiff's injury might seem to have a negligible effect on his major life activities, it is unnecessary to quantify the impact of the injury in this case, as the Plaintiff can state a claim if he shows that the VDOC regards him as an individual with a disability. Plaintiff alleges that his injury has been recognized by the Department of Veterans Affairs and the VDOC. *Id.* at 1. The VDOC has not contested this allegation, and the Plaintiff's claim is supported by the fact that the VDOC's medical department issued Plaintiff a no-cuff pass in order to accommodate the injury. As the Plaintiff's allegation is uncontested and supported by the limited evidence available to the Court, the Court finds that the Plaintiff has put forth sufficient evidence to state a claim as a disabled individual under the Act.[2]

As an individual who is viewed by the VDOC as disabled, the Plaintiff must still prove that he was excluded, as a result of his disability, from the benefits of a program or activity that receives federal funds. It might initially seem difficult to

---

**2.** Even if the VDOC were to put forth evidence rebutting the Plaintiff's assertion that it viewed his injury as a disability for purposes of the Rehabilitation Act, it would still appear that a permanent shoulder injury limiting the arm's range of movement qualifies as a disability under the Rehabilitation Act. *See Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667 (7th Cir.1998) (finding plaintiff's shoulder injury to constitute a qualifying disability under the ADA); *Cochrum v. Old Ben Coal Co.,* 102 F.3d 908 (7th Cir.1996) (holding that plaintiff's shoulder injury raised a genuine issue of material fact as to whether he was disabled under the ADA). The Court's decision is based solely on the Plaintiff's allegations. Medical evidence might produce a different conclusion on summary judgment or at trial.

view the Plaintiff as having been denied access to a "program" on the basis of his disability, as he does not claim to have been denied access to any particular program operated by the VDOC or Wallens Ridge. However, courts have construed "the benefits of a program or activity" to include the general rehabilitative and correctional services of state prisons, and have therefore required prisons to make "reasonable accommodations" for an inmate's physical disabilities in their day-to-day operations in order to comply with the mandates of the Rehabilitation Act. *See Torcasio v. Murray*, 862 F.Supp. 1482 (E.D.Va.1994) (holding that the Rehabilitation Act's reasonable accommodations requirement applies to an obese inmate's claim that the state prison was not adequately equipped to accommodate his disability), *rev'd on other grounds* in *Torcasio*, 57 F.3d 1340 [3]; *Randolph v. Rodgers*, 170 F.3d 850 (8th Cir.1999). Therefore, if the Plaintiff has alleged that the VDOC and Wallens Ridge failed to make "reasonable accommodations" for his disability, then he has stated a claim under the Rehabilitation Act.

**3.** The Fourth Circuit's decision in *Torcasio* relied on the unclear application of the Rehabilitation Act to state prisons. The court did not dispute the district court's decision that the Act, if it applies to prisons, requires *reasonable* accommodations to the everyday operations of a prison for the benefit of disabled individuals.

**4.** The Restatement of Agency Second interprets the doctrine of *respondeat superior* to hold masters liable for the tortious acts of a servant when:

(1) Conduct of a servant is within the scope of employment, if, but only if:
(a) it is of the kind he employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master, and

The Plaintiff has alleged that he was provided a reasonable accommodation by Wallens Ridge when he was given a cuff-front pass requiring all prison personnel to cuff the Plaintiff with his hands in front. (Pl.'s Aff. at 2.) However, the Plaintiff alleges that this accommodation was abruptly and viciously terminated when prison guards failed to heed the cuff pass and handcuffed the Plaintiff's arms behind his back. In addition, the Plaintiff claims that the Wallens Ridge guards ignored the medical order not once, but twice, making it clear that lower-level employees at the prison would not be willing to accommodate his disability. While these alleged actions may not represent official prison policy, the Fourth Circuit has ruled that *respondeat superior* liability is available against a program receiving federal funds in a Rehabilitation Act claim in order to further the broad purposes of the Act. *See Rosen v. Montgomery County*, 121 F.3d 154, 156 n. 3 (4th Cir.1997); *see also Delano–Pyle v. Victoria County*, 302 F.3d 567, 574–75 (5th Cir.2002); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir.2001); *Bonner v. Lewis*, 857 F.2d 559, 566–67 (9th Cir.1988).[4]

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master. Restatement (Second) of Agency § 228 (2002). In the present case, the servants of the VDOC, Anderson and Short, committed the allegedly tortious act during their normal shift, in the course of performing a cell search. As handcuffing was part of the authorized cell search procedure, Wallens Ridge and the VDOC were aware that physical force was required to carry out the search. The tortious act alleged in the present case, handcuffing the Plaintiff with his arms in back, only deviated slightly from the course of conduct authorized by the prison and the VDOC, handcuffing the Plaintiff's hands in front.

As the VDOC is vicariously liable for the acts of its employees, the two separate removals of the Plaintiff's medical form and the handcuffing of the Plaintiff's hands behind his back can be attributed to the VDOC for purposes of determining liability under the Rehabilitation Act. Given the wide latitude normally provided by courts in interpreting *pro se* claims, *see Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Gordon v. Leeke,* 574 F.2d 1147 (4th Cir.1978), the Plaintiff's Rehabilitation Act claim can be understood to allege that the VDOC failed to live up to its own promise of providing the Plaintiff with the reasonable accommodations due him under the Rehabilitation Act, as it failed to ensure that the medical order would be complied with by lower-level employees. Without these reasonable accommodations, Plaintiff was unable to enjoy the benefits that the VDOC and Wallens Ridge State Prison had to offer, including the provision of appropriate medical care. *See Randolph,* 170 F.3d at 858 (including "the provision of medical care" within the category of "benefits" that a disabled inmate should be able to receive from a prison); *see also Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) ("The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones.") (citations omitted).[5]

Thus, the only way in which *respondeat superior* would not apply is if the guards were not acting, at least in part, to further the interests of the VDOC.

The VDOC could argue that the guards were motivated by a personal grudge against the Plaintiff, as they would have had to violate a direct order of the institution in order to handcuff the Plaintiff with his arms behind his back. However, it is equally possible that the guards were motivated, at least in part, by a sincere desire to keep order in the institution, believing that the Plaintiff's medical waiver was unnecessary and counterproductive in encouraging inmates to seek exceptions from universal prison rules. *Cf. Williams v. Cloverland Farms Dairy, Inc.,* 78 F.Supp.2d 479, 483–84 (D.Md.1999) (finding material questions of fact as to whether employee was acting in the scope of her employment when she taunted and refused to serve a black customer). Thus, the Court is not able to say, as a matter of law, that the VDOC is not vicariously liable for the actions of its employees in handcuffing the Plaintiff with his arms behind his back in violation of the medical order.

5. The Court is troubled by the possibility that the VDOC could be liable in the present lawsuit for the actions of two individual guards, despite the VDOC's attempts to provide the Plaintiff with the accommodations that he is due under the Rehabilitation Act. However, the Court believes this result to be mandated by the manner in which federal courts have continued to expand the reach of liability under the Act.

As the Fourth Circuit has noted, it already seems " 'absurd to apply the Americans with Disabilities Act [and the Rehabilitation Act] to prisoners. Prisoners are not a favored group in society; the propensity of some of them to sue at the drop of a hat is well known; prison systems are strapped for funds; the practical effect of granting disabled prisoners rights of access that might require costly modifications of prison facilities might be the curtailment of educational, recreational, and rehabilitative programs for prisoners, in which event everyone might be worse off....' " *Amos II,* 178 F.3d at 216 (quoting *Crawford v. Indiana Dept. of Corrections,* 115 F.3d 481, 486 (7th Cir.1997)).

However, despite this initial reluctance to apply the Rehabilitation Act to state prisons, the Fourth Circuit has now gone a step further in extending the Act by adopting the theory of *respondeat superior* enunciated in *Bonner v. Lewis,* 857 F.2d 559. *See Rosen,* 121 F.3d at 157 n. 3. *Bonner* applied a theory of vicarious liability to employers under the Act in order to encourage them " 'to exercise special care in the selection, instruction and supervision' " of employees. 857 F.2d at 567 (quoting *Patton v. Dumpson,* 498 F.Supp. 933, 943 (S.D.N.Y.1980)). This theory of liability has the propensity to produce unjust results, particularly when applied in the prison context. In the present case, the Plaintiff has

As the Plaintiff has alleged and the VDOC has not denied that it considered Plaintiff disabled and that it failed to provide him with reasonable accommodations for his disability, Plaintiff has made out a *prima facie* claim for damages under section 504 of the Rehabilitation Act.

## IV

The only issue remaining to be discussed before considering the constitutionality of the Rehabilitation Act is the VDOC's argument in its Motion to Dismiss that the Act does not include a private right of action. The VDOC argues that courts do not have the authority to imply a right of action that is not expressly provided by Congress in the language of the Act. (Def.'s Mot. to Dismiss at 2–3) Therefore, the VDOC believes that the Plaintiff's Rehabilitation Act claim should be dismissed.

■ The Fourth Circuit has considered this argument several times, and it has

consistently held that there is a private right of action for individuals to bring suit under the Rehabilitation Act. *See Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 827–28 (4th Cir.1994) ("[E]very circuit that has addressed this question, including this one, has held that a private right of action exists."); *Davis v. Southeastern Cmty. Coll.*, 574 F.2d 1158, 1159 (4th Cir.1978); *see also Shepard v. Irving*, 204 F.Supp.2d 902, 910 (E.D.Va.2002). As noted in *Pandazides*, the Fourth Circuit's position on a private right of action under the Rehabilitation Act has been all but confirmed by the Supreme Court's analysis of the Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d–7. *Pandazides*, 13 F.3d at 828 n. 7. In the context of Title VI and Title IX, the Supreme Court analyzed the language used by Congress in the Rehabilitation Act Amendments and concluded that the language of the Amendments validated the Supreme Court's belief that a private right of action existed under the

admitted that the prison initially provided him with all the accommodations he was due under the Rehabilitation Act. Unfortunately, the tortious acts of two guards has now subjected the entire Virginia Department of Corrections to a lawsuit and possible trial. Such liability places unrealistic expectations on the ability of prisons and departments of correction to prevent correction officers in every instance from abusing their power and making harmful decisions that damage the rights of inmates. Even if additional training and supervision could prevent all possible abuses of power by prison guards, the cost of such measures could, as the Fourth Circuit feared, have the effect in a zero-sum fiscal environment of reducing the funds available for other prisoner programs.

A better rule in the prison context that balances the statutory rights of disabled inmates with the budgetary and management concerns of state prisons is the rule adopted by the Supreme Court for section 1983 claims in *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). For a supervisory entity, such as a municipality, to be liable for the

actions of its employees under section 1983, a plaintiff must prove a connection between the injury and a government action or custom which fairly represents official policy. *See id.* at 694, 98 S.Ct. at 2037–38. If such a rule were applied under the Rehabilitation Act in inmate cases such as the present, an inmate plaintiff would be required to prove that the actions of lower-level prison employees, such as correctional officers, are causally related to a prison or department of corrections policy, rule, or custom. This higher standard of proof would limit the circumstances in which inmates could file lawsuits under the Rehabilitation Act, focusing the threat of liability on those institutions that can properly be deemed responsible for the violation of a disabled inmate's rights under the Act.

However, because the Fourth Circuit has established that the broad theory of *respondeat superior* first adopted by the Ninth Circuit in *Bonner* applies to suits brought under the Rehabilitation Act, the Court is bound by precedent to hold that the Plaintiff has stated a claim in the present case for relief under the Act.

acts. *See Alexander v. Sandoval,* 532 U.S. 275, 280, 121 S.Ct. 1511, 1516, 149 L.Ed.2d 517 (2001); *Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 72, 112 S.Ct. 1028, 1036, 117 L.Ed.2d 208 (1992). While the Supreme Court has not expressly ruled on a private right of action under the Rehabilitation Act, the Rehabilitation Act Amendments affect the Rehabilitation Act in the exact same manner as Title VI and Title IX. *See* 42 U.S.C. § 2000d–7(a)(1).[6]

It is a settled point of law in the Fourth Circuit that a private right of action exists under the Rehabilitation Act. The only questions that remain for the Court to decide are constitutional in nature.

## V

The VDOC has presented two challenges to the constitutionality of the Rehabilitation Act in its Motion to Dismiss. VDOC first argues that it maintains absolute sovereign immunity from suit, that the Commonwealth has not consented to waive this immunity by receiving federal funds, and that Congress cannot constitutionally abrogate the Commonwealth's sovereign immunity under the Rehabilitation Act.

### Sovereign Immunity Under the Eleventh Amendment

The Eleventh Amendment to the United States Constitution states, "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This language has been broadly interpreted by the Supreme Court to grant states and their instrumentalities immunity from suit in federal court. *Seminole*

*Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). Such broad immunity from suit is often justified as a component of the high level of respect due states as "sovereign entit[ies] in our federal system." *Id.* As an arm of the sovereign Commonwealth of Virginia, the VDOC enjoys the same respect and immunity due the Commonwealth. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Bane v. Virginia Dep't of Corr.,* 110 F.Supp.2d 469, 471 (W.D.Va.2000).

■ However, a broad interpretation of sovereign immunity is not synonymous with absolute immunity, as three well-developed exceptions exist to the protections of the Eleventh Amendment: (1) Congress may abrogate state immunity if it unequivocally expresses its intent to do so and acts pursuant to a valid exercise of congressional power, *see Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. at 1123; (2) A state may waive its sovereign immunity by consenting to suit; and (3) Individuals may seek prospective relief against state officials for ongoing violations of federal law under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985); *Koslow v. Pennsylvania,* 302 F.3d 161, 168 (3d Cir.2002); *Sandoval v. Hagan,* 197 F.3d 484, 492 (11th Cir.1999), *rev'd on other grounds, Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

■ At issue in the present case is whether the Rehabilitation Act falls into

---

**6.** 42 U.S.C. § 2000d–7(a)(2) states that, "[i]n a suit against a State," all remedies applicable to a suit against an entity other than a state are available to a plaintiff under the Rehabilitation Act. As this language expressly authorizes suits against the states, the Supreme Court thought it "beyond dispute" that such language would imply a private right of action for individuals to sue the states. *See Sandoval,* 532 U.S. at 280, 121 S.Ct. at 1516.

one of these categories and validly authorizes suits by individuals against the states. Section 504 of the Rehabilitation Act was passed pursuant to the Spending Clause. *See, e.g., Shepard,* 204 F.Supp.2d at 915. The Spending Clause of the United States Constitution gives Congress the power to "lay and collect Taxes, Duties, Imposts, and Excises to pay the Debts and provide for the common Defence and general Welfare of the United States." Article I, § 8, cl. 1. The Supreme Court has interpreted this broad grant of power to give Congress the ability to "attach conditions on the receipt of federal funds" and " 'further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directions.' " [7] *South Dakota v. Dole,* 483 U.S. 203, 206, 107 S.Ct. 2793, 2795–96, 97 L.Ed.2d 171 (1987).

██ One of the conditions that Congress may attach to federal funds given to states is the requirement that a state waive its sovereign immunity from suit if it chooses to accept such funds. *See, e.g., Atascadero,* 473 U.S. at 247, 105 S.Ct. at 3149–50; *Bell Atlantic v. MCI Worldcom,* 240 F.3d 279, 289 (4th Cir.2001), *rev'd on other grounds, Verizon Maryland, Inc. v. Public Service Com'n of Maryland,* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002); *Booth v. Maryland,* 112 F.3d 139, 145 (4th Cir.1997). However, for a state to constructively waive its immunity from suit by accepting funds tagged with a waiver condition, Congress must express "a clear intent" to condition funds on the waiver. *Atascadero,* 473 U.S. at 247, 105 S.Ct. at 3149–50. The requirement of a clear intent is strictly construed, as courts have

generally employed a presumption against implicit waiver except in circumstances involving the clearest congressional language. *See Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996); *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974); *McConnell v. Adams,* 829 F.2d 1319, 1329 (4th Cir.1987). Thus, for a court to find that a state has waived its sovereign immunity by accepting federal funds, the waiver condition attached to the funds "must be unequivocally expressed in statutory text." *Lane,* 518 U.S. at 192, 116 S.Ct. at 2096.

The Supreme Court has faced the question of waiver in the context of the Rehabilitation Act before, in *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171. Reviewing the Act and the Court of Appeals decision upholding the constitutionality of the Act under the Spending Clause, the Court reversed, finding that the Act did not evince "a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Id.* at 247, 105 S.Ct. at 3149–50. In direct response to this decision, Congress enacted an amendment to the Rehabilitation Act which provided the clear language necessary to show Congress's intent to condition federal funds on a state's waiver of its sovereign immunity: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973." 42 U.S.C. § 2000d–7(a)(1). The Supreme Court was apparently satisfied by Congress's attempt in section 2000d–7 to craft an unambiguous

---

7. Because of the gratuitous nature of the funds provided by Congress to states and state agencies, the conditions that Congress is constitutionally permitted to attach to the funds

under the Spending Clause are not limited by the express grant of power to the legislature in Article I of the Constitution. *Dole,* 483 U.S. at 207, 107 S.Ct. at 2796.

condition, as the Court has since referenced the section as an example of Congress acting with "care" in crafting an "unambiguous waiver of the States' Eleventh Amendment immunity." *See Lane*, 518 U.S. at 200, 116 S.Ct. at 2100.

■ Given the Court's effusive praise for the clarity of section 2000d–7, it is no surprise that at least six circuit courts, including the Fourth Circuit Court of Appeals, have ruled that the section represents the clear and express intent of Congress to condition the waiver of state sovereign immunity on the receipt of federal funds. *See Bell Atlantic*, 240 F.3d at 292 ("[A]ny state reading [2000d–7] would clearly understand that ... it was consenting to resolve disputes regarding alleged violations of the Act's anti-discrimination provisions in federal court."); *Litman v. George Mason Univ.*, 186 F.3d 544, 554 (4th Cir.1999) ("In enacting [2000d–7], Congress responded with 'care' to '[the Supreme Court's] decision in *Atascadero* by crafting an unambiguous waiver of the state's Eleventh Amendment immunity."); *Koslow*, 302 F.3d at 170; *Robinson v. Kansas*, 295 F.3d 1183, 1190 (10th Cir.2002); *Douglas v. California Dep't of Youth Auth.*, 271 F.3d 812, 819 (9th Cir.2001); *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir.2000); *Sandoval*, 197 F.3d at 493. In section 2000d–7, Congress has provided state governments and their agencies with a clear choice: accept federal funds and waive sovereign immunity for individual suits brought under the Rehabilitation Act or reject federal money and maintain immunity from suit. As the language Congress used in crafting section 2000d–7 is plain and unambiguous, this Court concurs with the views of the Supreme Court and the Fourth Circuit and holds that acceptance of federal funds by a state waives its sovereign immunity from suits brought under the Rehabilitation Act in federal court.

The VDOC apparently believes that the Supreme Court's recent ruling in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), provides the Court with the ability to discount the heavy weight of authority supporting the clarity of the language used by Congress in crafting section 2000d–7. In *Garrett*, the Supreme Court held that suits in federal court to recover money damages under Title I of the Americans with Disabilities Act ("ADA") were barred by the Eleventh Amendment. Unlike the Rehabilitation Act, Congress passed the ADA pursuant to section 5 of the Fourteenth Amendment. Thus, instead of looking at waiver as an exception to the state's sovereign immunity, the Court examined the ability of Congress to abrogate sovereign immunity under section five to protect the disabled against discrimination. Since *Garrett* was decided, several federal courts, including two circuit courts, have ruled that a state did not waive its Eleventh Amendment sovereign immunity under the Rehabilitation Act by accepting federal funds. *See Pace v. Bogalusa City Sch. Bd.*, 325 F.3d 609 (5th Cir.2003); *Garcia v. SUNY Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 113 (2d Cir.2001); *Garrett v. University of Alabama*, 223 F.Supp.2d 1244 (N.D.Ala.2002). The reasoning used by these courts, as first enunciated by the Second Circuit in *Garcia*, focuses on whether a state, in accepting federal funds during the period of time applicable to the lawsuits, would have actually realized that it was abandoning its sovereign immunity due to the abrogation of such immunity in the ADA. *Garcia*, 280 F.3d at 114. In *Garcia*, the period of time involved in the dispute was September 1993 through August 1995. *Id.* at 114 n. 4. Because there was no question at this time that the ADA

validly abrogated state sovereign immunity under section five of the Fourteenth Amendment, the Second Circuit reasoned that a state could not have thought it was bartering away anything of substance in accepting federal funds under the Rehabilitation Act, as the ADA had already stripped the states of their sovereign immunity. *Id.* at 114.

However, the Second Circuit recognized that its ruling was limited to disputes arising prior to the initial wave of court decisions questioning the constitutional validity of the ADA's abrogation of sovereign immunity: "We recognize that an argument could be made that if there is a colorable basis for the state to suspect that an express congressional abrogation is invalid, then the acceptance of funds conditioned on the waiver might properly reveal a knowing relinquishment of sovereign immunity." *Id.* at 114 n. 4. In other words, the Second Circuit understood that if courts had begun to cast doubt on the constitutionality of the ADA prior to a state's acceptance of federal funds, then the state would have had reason to think

more critically about waiving sovereign immunity under the Rehabilitation Act.

The altercation that formed the basis of the present suit occurred in September of 2001, and Plaintiff filed his complaint in November of 2001. The Supreme Court handed down its decision on the ADA in *Garrett* in February of 2001. Even assuming that the Commonwealth of Virginia made its decision to accept federal funds at year-end 2000 or early 2001, the district court decision in *Garrett* holding that the Eleventh Amendment barred suits against the states under Title I of the ADA was decided in 1998, and oral arguments before the Supreme Court were conducted in October of 2000. Therefore, even if this Court were to adopt the Second Circuit's underlying reasoning in its decision in *Garcia*, the difference in the level of certainty over the validity of the ADA's abrogation of state sovereign immunity would force a difference in result in the present case.[8] The Commonwealth of Virginia, when it accepted federal funds for the VDOC for 2001, had a "colorable basis" to suspect that the Supreme Court could invalidate

---

**8.** The Second Circuit's reasoning in *Garcia* is open to criticism even for disputes arising prior to the debate over the ADA's validity. Even if states accepted federal funds under the Rehabilitation Act with the belief that they had already lost their sovereign immunity under the ADA, there is no dispute that they still understood the import of the clear language of the Rehabilitation Act waiver provision. *Garcia* seems to suggest that because the states were in such a favorable position vis-a-vis the federal government in the trade-off established by the waiver provision of the Rehabilitation Act, as they were essentially receiving money from the federal government without providing any consideration in return, they should continue to receive the lopsided benefit of the bargain when the ADA's abrogation of sovereign immunity was ruled invalid. This understanding of the benefits of the bargain seems particularly one-sided. If the Rehabilitation Act is indeed a bargained-for exchange, then both sides accepted the

risk, implicit in any deal, that one side of the bargain might come out on top due to circumstances beyond either party's control. The federal government chose to provide funds as long as states waived their sovereign immunity, regardless of whether the ADA was valid. It did so presumably because, for any number of possible reasons, the ADA's abrogation of sovereign immunity could be struck down. When it seemed that the ADA was constitutional, before the Court's decision in *Garrett*, the states were the clear winners in the bargain under the Rehabilitation Act. After the ruling, the pendulum swung in favor of the federal government, as disabled individuals were still able to seek recompense against state governments for a violation of the Rehabilitation Act. That the states are now the losers in the bargain does not mean that the waiver of sovereign immunity under the Rehabilitation Act was an unfair or coercive exchange.

the ADA's abrogation of state sovereign immunity in *Garrett.*

It is unnecessary to consider the VDOC's Fourteenth Amendment arguments, as the VDOC knowingly waived its sovereign immunity from suit under the Rehabilitation Act when it accepted federal funds.

## Coercive Conditions and the Tenth Amendment

The VDOC next argues in its Motion to Dismiss that, even if the Rehabilitation Act is found to be a valid exercise of Congress's power, the Act "plainly violates the Tenth Amendment." (Mot. to Dismiss at 6–7) In support of this argument, the VDOC notes that "federal statutes that 'require the States to govern according to Congress' instructions' " are constitutionally invalid, and a regulation that dictates how states run their prisons "goes to the very core" of state sovereignty. *Id.* at 7.

■ The federal government has no power under the Spending Clause to force the states to take any action. States have a choice under the Spending Clause to accept funding and federal demands conditioned on the receipt of such funding or simply decline federal assistance. This choice is freely made as long as the funds conditioned are not so necessary to a state that the only practical choice is to accept the funds and the accompanying federal demands. *See South Dakota v. Dole,* 483 U.S. at 211, 107 S.Ct. at 2798.

While the Supreme Court has not stated the exact point at which a condition attached to federal funds becomes unconstitutionally coercive, the Fourth Circuit has shown its displeasure with acts of Congress that place all-or-nothing conditions on significant amounts of federal funds in order to protect a relatively minor interest. *See West Virginia v. U.S. Dept. of Health and Human Services,* 289 F.3d 281

(4th Cir.2002); *Com. of Vir. Dep't of Educ. v. Riley,* 106 F.3d 559, 569–70 (4th Cir. 1997), *abrogated* by *Amos I,* 126 F.3d 589. In *Shepard v. Irving,* 204 F.Supp.2d at 918–19, Judge Lee recognized the Fourth Circuit's position on spending conditions but still ruled that George Mason University's choice to forfeit fourteen percent of its operating budget (approximately $44,183,959) or comply with the mandates of the Rehabilitation Act was not a coercive choice. Judge Lee distinguished the Rehabilitation Act from all-or-nothing statutes, relying on the piecemeal manner in which a state may choose to accept or reject federal funds for various state agencies under the Rehabilitation Act. *See id.* at 918; *see also Jim C.,* 235 F.3d at 1081 (holding that Arkansas' option to sacrifice twelve percent of its annual education budget ($250,000,000) or comply with the Rehabilitation Act is not coercive). The same reasoning was used by the Third Circuit to uphold the Rehabilitation Act in the context of a claim by an inmate against the Pennsylvania Department of Corrections. *Koslow,* 302 F.3d at 174 (holding that the state's decision to waive all federal assistance to the Department of Corrections, while it would "no doubt" result in "fiscal hardship," is a free choice that does not rise to the level of an *unconstitutionally coercive condition*).

■ The VDOC has not provided the Court with any quantification of the amount of federal funds received by the agency relative to its annual operating budget, and it has not presented evidence that disabled individuals represent a minute section of the prison population in comparison to the amount of money the VDOC would be required to forfeit to maintain sovereign immunity. Without such information, any decision declaring the waiver provision of the Rehabilitation Act to be an unconstitutionally coercive condition would

be based on sheer guess work. Rather than engage in speculation, the Court is inclined to agree with the conclusions of Judge Lee and the Third and Eighth Circuits that the choice provided to states by Congress in the Rehabilitation Act is not an unconstitutionally coercive choice. The Commonwealth of Virginia, like all states under the Act, has the flexibility to comply with the Act on a piecemeal basis, accepting federal funds for some agencies and rejecting funds for others. It is not clear to the Court on the record before it that such a choice represents an unconstitutional and coercive condition in violation of the Tenth Amendment.

## V

Defendants Short[9], Anderson and Hockett have moved for summary judgment on the Plaintiff's deliberate indifference and excessive force claims. Defendants Short and Anderson both dispute the existence of a medical waiver on the Plaintiff's cell door when they conducted the cell search. Defendant Anderson also claims that the Plaintiff has failed to allege that he was personally involved in the handcuffing that supposedly led to the Plaintiff's injury.

Upon motion for summary judgment, the Court must view the facts, and inferences to be drawn from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Nguyen v. CNA Corp.*, 44 F.3d 234, 236–7 (4th Cir.1995). Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). However, the mere "existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Plaintiff has stated claims of deliberate indifference and excessive force in his complaint. A claim of deliberate indifference to a serious medical need requires proof of an objective and a subjective component. The objective component is met if the deprivation of an inmate's medical needs is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834, 114 S.Ct. at 1977. The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837, 114 S.Ct. at 1979; *see also Johnson v. Quinones*, 145 F.3d 164 (4th Cir.1998).

In an excessive force claim, the Supreme Court has held that the use of physical force which constitutes "the unnecessary and wanton infliction of pain" by a prison guard upon an inmate violates the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). When officials stand accused of the excessive use of force, the key inquiry is "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992), citing *Whitley v. Albers*, 475 U.S. at 320–21, 106 S.Ct. at 1085. In making this determination, the court must balance such factors as the need for the application of force, the relationship

---

**9.** Defendant Short did not submit a motion for summary judgment, but he did submit an affidavit in support of his motion to dismiss that, for purposes of this motion, the Court will treat as a motion for summary judgment.

between the need and the amount of force actually applied, and the extent of injury inflicted. *Id. De minimis* injury can be conclusive evidence that the force used was also *de minimis* and, therefore, not violative of constitutional protections. *See Norman v. Taylor,* 25 F.3d 1259 (4th Cir. 1994).

■ In their affidavits in support of summary judgment, Defendants Short and Anderson argue that there was no medical waiver form on the door of the Plaintiff's cell at the time they performed the routine cell search, and they claim that they were unaware that the Plaintiff had any particular medical requirements. Plaintiff vigorously disputes this claim in his affidavit, stating that on September 3, 2001, during the routine cell search, "defendants Short and Anderson saw the medical notice on my cell door and read the document. After discussing the matter Short told me the order was not valid and Anderson ripped it off my cell door and tossed it into the trash." (Aff. of Pl. at 2). In support of his version of the facts, the Plaintiff provides the type of hard evidence that is often rare in 1983 actions brought by prisoners. The Plaintiff has included in his documents a medical order from the Medial Department at Wallens Ridge that was apparently approved by Warden S.K. Young on May 30, 2000, prior to the date of the cell search conducted by the Defendants. As institutional procedure appears to require that a valid standing medical order be taped to the inmate's cell door (Aff. of Def. Hockett at 5), it is reasonable to believe that the order would have been in place on the Plaintiff's door at the time of the cell search. Regardless, this factual dispute is a prime example of the type of dispute that should be resolved by a jury at trial. Viewing the facts in the light most favorable to the Plaintiff, the allegation that Defendants Anderson and Short

ignored the requirements of a medical order they knew to be valid and deliberately caused harm to the Plaintiff states claims for deliberate indifference, *see Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (holding that intentional interference with prescribed medical care can constitute deliberate indifference); *Shelton v. Angelone,* 148 F.Supp.2d 670, 678 (W.D.Va.2001) (citing *Miltier v. Beorn,* 896 F.2d 848 (4th Cir.1990)), and excessive force, *see United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990) (holding that punitive intent can be inferred from the absence of legitimate, non-punitive correctional objectives).

■ Defendant Anderson's argument that the Plaintiff has failed to allege that Anderson was personally involved in the handcuffing is also unsuccessful. To prove a claim of deliberate indifference to a serious threat of physical harm under the Eighth Amendment, a plaintiff must show that a defendant's "action or *inaction* result[ed] in or creat[ed] a sufficiently serious risk of a deprivation that objectively results in denial of the 'minimal civilized measure of life's necessities' and a 'sufficiently culpable state of mind.'" *Winfield v. Bass,* 106 F.3d 525, 531 (4th Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. 825, 831–34 & n. 2, 114 S.Ct. 1970, 1976–77 & n. 2, 128 L.Ed.2d 811 (1994)) (emphasis added). The Plaintiff has alleged that Anderson ripped the medical waiver off of his cell door and stood by while Short proceeded to violate the order and knowingly cause the Plaintiff serious pain and physical harm. (Pl.'s Aff. at 2.) Plaintiff has also alleged that Anderson had a sufficiently culpable state of mind, as he has alleged that Anderson was the individual who threw the valid medical order in the trash. *Id.* In fact, while Anderson claims not to have seen a medical form on the Plaintiff's cell door on September 3, 2001,

he admits removing a valid medical form from the Plaintiff's cell door on September 27, 2001. (Aff. of Anderson at 2–3.) Thus, the mere fact that Anderson did not personally handcuff the Plaintiff does not defeat a claim of deliberate indifference, as the Plaintiff has alleged inaction resulting in a serious risk of harm and a sufficiently culpable state of mind. *See Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir.1994).

 The same reasoning can be used in support of Plaintiff's excessive force claim against Anderson. Plaintiff has alleged that Short maliciously intended to cause him harm in handcuffing him with full knowledge of the medical waiver. In his affidavit, Plaintiff places Anderson next to Short during the handcuffing, and he alleges that Anderson took part in the build up to the handcuffing by ripping the waiver form from his cell door. (Pl.'s Aff. at 2.) If Anderson took part in the events leading up to the handcuffing and stood by while Short allegedly used excessive force, he may be liable for excessive force even though he did not lay a hand on the Plaintiff. *See Merritt v. Hawk*, 153 F.Supp.2d 1216, 1224 (D.Colo.2001) ("[A]n allegation that a defendant guard simply stood by and observed a beating by other guards and failed to take action to stop it is sufficient, if true, to demonstrate an Eighth Amendment violation."); *Laury v. Greenfield*, 87 F.Supp.2d 1210, 1216 (D.Kan. 2000) ("Prison guards who observe the imposition of excessive force upon a prisoner at the hands of another guard but who take no steps to protect the prisoner violate the Eighth Amendment."); *cf. Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (stating that supervisors may be liable for the excessive force of subordinates for deliberate indifference to the amount of force used). Therefore, viewing the facts in the light most favorable to the Plaintiff,

both Short and Anderson may be liable for the use of excessive force.

 Defendant Hockett has also moved for summary judgment on the Plaintiff's deliberate indifference to a serious medical need and excessive force claims. Hockett was the supervisor of Short and Anderson in September of 2001. Both the Plaintiff and Hockett acknowledge that, sometime during the routine cell search, Short called Hockett to inquire about the medical waiver. Hockett states in his Motion for Summary Judgment that Short called to ask Hockett if he knew of any standing medical order for the Plaintiff. (Mot. for Summ. J. at 3.) Hockett says he then called his supervisor, Major Yates, to ask whether the Plaintiff had been issued such an order. Major Yates confirms this statement in his own affidavit. (Yates Aff. at 1–2.) The Plaintiff disputes this version of events: "Short then told me that he had read the medical order to Hockett, and Hockett had told Short to cuff my hands behind my back despite the medical order." (Pl.'s Aff. at 3.) Viewing the facts in the light most favorable to the Plaintiff, Hockett was notified of the existence of a valid medical waiver but chose to disregard the waiver and ordered his subordinates to violate that order. The law is clearly established that a prison official's deliberate disregard of the serious medical needs of an inmate is a violation of the inmate's constitutional rights. *See Estelle v. Gamble*, 429 U.S. at 102, 97 S.Ct. at 290; *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 104 (4th Cir.1995). As to the claim of excessive force, viewing the facts in the light most favorable to the Plaintiff, it appears that Hockett ordered Short to handcuff the Plaintiff with his arms in back knowing that such an action would cause him pain. As the act of handcuffing is the act that constitutes wanton infliction of physical

pain, Hockett's decision to order performance of the act would constitute excessive force.[10] *See Shelton v. Angelone,* 183 F.Supp.2d 830, 836 (W.D.Va.2002) (holding that one means of supervisory liability in excessive force cases is to prove direct participation in the act that constitutes excessive force); *see also Slakan,* 737 F.2d at 372. While Hockett is correct that cuffing inmates' hands behind their back is consistent with an institutional policy designed to maintain control, he does not discuss the fact that Plaintiff had been expressly exempted from this policy by prison medical personnel.

█ Hockett also argues in his Motion for Summary Judgment that Plaintiff has failed to state a claim of excessive force because he cannot show any serious physical injury from the handcuffing. Hockett points specifically to the absence of any medical claims by the Plaintiff on September 3, 2001, the day of the handcuffing. In his response to the denial of his initial grievance, Plaintiff vigorously objected to the assertion that he did not submit a medical claim after the incident: "I *DID* request and receive medical assistance! The floor officer, c/o Fannon can verify that I was seen by the evening pill call nurse because of my complaint of shoulder pain. But by the time the nurse saw me my shoulder had poped [sic] back in place on its own." (Inmate Grievance Response Form at 2.) Plaintiff has consistently alleged throughout his complaints that his shoulder was dislocated and that he suffered intense pain for a period of approximately one week. The mere absence of medical reports or permanent scars documenting the Plaintiff's injury does not render the claim immaterial, particularly when the Plaintiff has alleged specific facts

regarding his claim. *See Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 ("When prison officials maliciously and sadistically cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident."); *Norman v. Taylor,* 25 F.3d 1259, 1264 n. 4 (4th Cir.1994); *Shelton,* 183 F.Supp.2d at 835 (holding that repeated shocking with stun gun, even if resulting in no permanent injury, can constitute excessive force). It is up to a jury to determine whether the pain allegedly suffered by the Plaintiff amounts to anything more than *de minimis* injury.

For these reasons, the Defendants' motions for summary judgment must be denied. The essential disputes between the Defendants in their motions for summary judgment and the Plaintiff in his complaint lie in the area of material fact an are a uniquely suited for resolution by a jury.

### Conclusion

As the Court finds that the Plaintiff has stated a claim and has a private right of action under the Rehabilitation Act, and as the mandates of the Act do not violate the Constitution, the Defendant VDOC's Motion to Dismiss is DENIED. The Court also finds that, in response to the Motions for Summary Judgment filed by Defendants Anderson, Short, and Hockett, the Plaintiff has presented genuine issues of material fact to be resolved at trial, and the motions are therefore DENIED.

### ORDER

This matter is before the Court on the Virginia Department of Correction's ("VDOC's") Motion to Dismiss challenging the constitutionality of section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the motions for summary judgment filed

---

**10.** It is unnecessary to consider any arguments concerning supervisory liability, as the Plaintiff has alleged facts in his complaint

sufficient to state a claim against Hockett for his direct role in the handcuffing.

by Defendants Hockett, Anderson, and Short pursuant to Rule 56 of the Federal Rules of Civil Procedure. For reasons more fully explained in the accompanying Memorandum Opinion, it is hereby

### ADJUDGED AND ORDERED

that

1) The Virginia Department of Correction's Motion to Dismiss the Rehabilitation Act claim against it is **DENIED;**

2) The motions for summary judgment filed by Defendants Hockett, Anderson, and Short as to the section 1983 claims against them are **DENIED.**